IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEFFREY P. DAVIS )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>)<br>NANCY A BERRYHILL, Acting )<br>Commissioner of Social Security, )<br>    Defendant. ) | Case No. 16-cv-7372<br><br>The Honorable Michael T. Mason |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant Jeffrey Davis ("Claimant") brings this motion for summary judgment seeking judicial review of the final decision of the Acting Commissioner of Social Security ("Commissioner"). The Commissioner denied Claimant's claim for disability insurance benefits under Section 1614(a)(3)(A) of the Social Security Act (the "Act"). 42 U.S.C. § 1383(c). The Commissioner filed a cross-motion for summary judgment, requesting that this Court uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Claimant's motion for summary judgment [18] is granted and the Commissioner's cross-motion for summary judgment [22] is denied.

## I. BACKGROUND

### A. Procedural History

Claimant filed an application for a period of disability and supplemental security income on August 26, 2012. (R. 15.) Claimant alleges that he become disabled on

1

May 1, 2010, but later amended the onset date to September 4, 2012 due to degenerative joint disease and obesity. (R. 15, 335.) His application was initially denied on October 23, 2012, and again on March 15, 2013, after a timely request for reconsideration. (R. 15.) On April 26, 2013, Claimant filed his request for a hearing. (*Id.*) On January 14, 2015, he testified before the ALJ Karen Sayon. (R. 24.) On March 16, 2015, the ALJ issued a decision denying Claimant's application for supplemental security income. (R. 15-24.) On May 19, 2015, Claimant requested review by the Appeals Council. (R. 335.) On June 15, 2016, the Appeals Council denied Claimant's request for review, at which time the ALJ's decision became the final decision of the Commissioner. (R. 4.); *Zurawski v. Halter*, 245 F.3d. 881, 883 (7th Cir. 2001); 20 C.F.R. § 404.955, 404.981. Claimant subsequently filed this action in the District Court.

### B. Medical Evidence

#### 1. Dr. Ngu, Internal Medicine

On April 8, 2011, Dr. Lawrence Ngu saw Claimant for the first time. (R. 380.) At this appointment, Dr. Ngu completed Claimant's annual exam. (R. 349.) During this exam, Claimant stated his symptoms included joint pain, joint stiffness, and joint swelling. (*Id.*) Claimant did not complain about muscle cramps, joint redness, or joint warmth. (*Id.*) Dr. Ngu's physical exam of Claimant found his musculoskeletal to have a "normal range of motion, normal strength, no tenderness, no swelling, and normal gait." (R. 350.) After his examination, Dr. Ngu diagnosed Claimant with "probable degenerative joint disease / osteoarthrosis." (R. 350.)

Claimant again saw Dr. Ngu on June 1, 2011 for a follow-up appointment. (R. 347.) At this meeting, Dr. Ngu's treatment notes described Claimant as stable and reported no new complaints. (R.347-48.) Dr. Ngu reported that Claimant had a normal range of motion, normal strength, no tenderness, and no swelling. (R. 379.) On January 17, 2012, Claimant attended a follow-up appointment with Dr. Ngu and reported no new complaints, but stated he was still experiencing pain. (R. 375.)

On February 11, 2013, Claimant again visited Dr. Ngu. (R.360.) During this visit, Dr. Ngu increased Claimant's Tramadol prescription for pain and removed Claimant's previous prescription for Ibuprofen 800. (R. 361.) Dr. Ngu also informed Claimant to continue to take his Ranitidine as prescribed. (*Id.*) Dr. Ngu's report noted that Claimant was not in pain at the time. (R. 368.) Also at this appointment, Dr. Ngu completed a residual functional capacity ("RFC") questionnaire on behalf of the Claimant. (R. 382.) On the questionnaire, Dr. Ngu stated he had seen Claimant every three to six months for the last year and that he diagnosed Claimant with osteoarthritis. (*Id.*) Dr. Ngu noted that Claimant's symptoms "frequently" interfered with his attention and the concentration required to perform simple work-related tasks. (*Id.*) Dr. Ngu also stated Claimant could walk two city blocks without rest or significant pain. (*Id.*) Dr. Ngu noted Claimant can use his hands, fingers, and arms twenty-five percent of the time during an eight-hour work day. (R. 383.) On May 7, 2013, Claimant attended a follow-up appointment with Dr. Ngu to have his medications renewed. (R. 365.)

### 2. Aunt Martha's Health Center

In 2013, Claimant began seeing Dr. Anna Pacis at Aunt Martha's Health Center ("Aunt Martha's."). (R. 452.) On September 17, 2013, Claimant attended an

3

appointment at Aunt Martha's to obtain a "functional capacity evaluation" so he could apply for disability. (R. 386, 400.) These appointment notes described Claimant's pain as zero. (R. 401.) On October 21, 2013, Claimant again sought treatment for pain at Aunt Martha's. (R. 396.) Later, in 2014, a physician at Aunt Martha's prescribed Claimant a cane. (R. 419.)

A May 2014 x-ray of Claimant's knee found: "Bilateral knees appear relatively symmetric. The medial and lateral compartment joint space intact. No significant degenerative changes." (R. 426.) An Aunt Martha's visit report from May 4, 2014, noted Claimant's pain as a three on a scale of ten. (R. 430.) A report dated May 27, 2014 described Claimant's pain as a five on a scale of ten. (R. 432.)

In July of 2014, Claimant began physical therapy. (R. 420.) At Claimant's first appointment, he informed physical therapist Amber Kline that "he bikes daily." (R. 479.) Claimant also told her that his pain rated as an eight on a scale of ten, he does not drive, and he was not working. (*Id.*) Ms. Kline's report noted that Claimant displayed impaired gait and the ability to ascend-descend steps. (R. 480.) Ms. Kline's report also stated that he would benefit from physical therapy twice a week for six weeks "to improve gross function and mobility and to decrease risk of fall due to knee instability…" (*Id.*) In addition, on July 19, 2014, Claimant reported his pain as a four on a scale of ten. (R. 437.) On January 7, 2015, Claimant went to Aunt Martha's complaining of ongoing knee pain at a five on a scale of ten. (R. 452.)

### 3. Dr. Sompalli Chandrasekh, Orthopedic Specialist

In October of 2014, Claimant began seeing orthopedic surgeon, Dr. Sompalli Chandrasekh, at St. Anthony's Hospital for his chronic knee pain. (439, 452.) At his

4

October 10, 2017 appointment, Dr. Chandrasekh diagnosed Claimant with "osteoarthrosis local prim lower leg: 715.16 B/L knee." (R. 440.) To treat Claimant's pain, Dr. Chandrasekh gave Claimant a Lidocaine injection in his right knee, advised that he should have his knees x-rayed, and scheduled him for a reevaluation the following week. (*Id.*) Claimant's x-ray results revealed that the bones and joints in his left and right knees were normal. (R. 442-43.) Both Claimant's left and right knees were "unremarkable." (*Id.*) At Claimant's follow-up appointment, on October 17, 2014, Claimant reported the Lidocaine injection "helped him significantly with the pain." (R. 445.) During this appointment, Claimant described the pain in his left knee as an eight on a scale of ten and worse with movement. (*Id.*) To assist with the pain, Dr. Chandrasekh gave Claimant another Lidocaine injection in his left knee. (R. 446.)

On January 16, 2015, Dr. Chandrasekh provided his medical opinion regarding Claimant's physical capacity for work. (R. 478.) Dr. Chandrasekh stated Claimant could not lift and carry ten pounds for up to two-thirds of an eight-hour work day. (*Id.*) Dr. Chandrasekh wrote Claimant could not lift or carry heavier items because of his "severe...arthritis…" (*Id.*) Dr. Chandrasekh also noted Claimant could stand or walk for thirty to forty-five minutes without a break. (*Id.*) If Claimant was permitted to take breaks, Dr. Chandrasekh stated he could work for two hours in an eight-hour work day due to severe right and left arthritis. (*Id.*)

### 4. MetroSouth Medical Center

On January 12, 2015, Claimant fell trying to get out of bed. (R. 461.) After the fall, Claimant experienced sharp, stabbing, burning knee pain and sought treatment at the emergency department of MetroSouth Medical Center. (R. 453, 461.) At the

5

medical center, Dr. Lisa Rome attended to Claimant. (R. 461.) After a physical exam and reviewing Claimant's x-rays, Dr. Rome diagnosed Claimant with arthritis, gout, and bilateral knee pain. (R. 462-63.) At the appointment, Claimant requested a knee brace. (R. 461.) On the same day, Dr. Rome discharged the Claimant with instructions to rest, ice, and elevate his knee and information regarding degenerative arthritis. (R. 454-55.) Dr. Rome also ordered crutches and a knee immobilizer for Claimant and prescribed hydrocodone for Claimant's pain. (R. 456.) As a follow up to Claimant's emergency room visit, on May 19, 2015, Claimant received an MRI on his knee. (R. 486.) The MRI revealed mild to moderate patellofemoral and lateral compartment chondromalacia. (R. 486.)

### 5. Bureau of Disability Determination

On October 17, 2012, Dr. Pail examined Claimant at the request of the Bureau of Disability Determination Service. (R. 353.) Claimant informed Dr. Pail he had a history of joint pain in his feet, hands, knees, elbows, and shoulders. (*Id.*) Claimant reported the pain started in 2011. (*Id.*) After examining Claimant, Dr. Pail found his gait and speech to be normal. (R. 354.) Dr. Pail also found Claimant's extremities and musculoskeletal to be normal with the exception that Claimant did have some difficulty walking on his right heel and right toes. (R. 355.) Dr. Pail x-rayed Claimant's right knee. (R. 356.) Claimant's x-ray results produced no evidence of fracture, dislocation or intrinsic osseous abnormalities, and they indicated his joint spaces are maintained, and identified soft tissue in the suprapatellar region compatible with small to moderate joint effusion. (*Id.*)

### C. Claimant's Testimony

Claimant testified before the ALJ on January 1, 2014. (R. 37-57.) At the time of the hearing, he was fifty-two years old and living in the basement of a friend's home. (R. 38.) Claimant stated that he struggles to go up the stairs and often just stays in the basement. (*Id.*) The basement has a bedroom, bathroom, and kitchen. (*Id.*)

When asked how he traveled to the hearing, Claimant stated that he drove. (R. 39.) Claimant testified he has no problems driving. (*Id.*) Claimant stated his other activities include laundry, cooking, and grocery shopping, and he has no hobbies. (R. 51.) Claimant stated he passes the time by playing games on his IPad. (R. 52.) His typical day includes eating breakfast, reading the newspaper, doing some light house cleaning or errands, and watching television. (R. 52-53.) On Sundays, Claimant attends church. (R. 53.)

Claimant testified that he obtained his GED. (R. 39.) He most recently worked for a local church as a security guard in September of 2011. (R. 39-41.) In this position, Claimant worked two days a week, watching the parking lot while the congregation attended the church services. (R. 41.) From 2000 to 2001, Claimant stated he worked as a janitor at Head Start. (*Id.*) While working as a janitor, Claimant testified that he would occasionally lift more than fifty pounds. (*Id.*) Claimant's other duties included emptying the garbage, mopping the floor, and other cleaning. (R. 42.)

When asked why he is no longer able to work, Claimant testified that the pain in his knees and hands prevents him from working. (*Id.*) Claimant stated his right knee is worse than his left, but both cramp, lock up, occasionally swell, and cause him pain. (R. 43.) Claimant rated the pain in his right knee as normally between a six or seven on a

7

scale of ten.  (*Id.*)  Claimant then rated the pain in his left knee as a five on a scale of ten.  (*Id.*)

In order to treat his knee pain, Claimant had an injection in each knee in October of 2013.  (*Id.*)  Although the injections only help for about a week, Claimant stated he is scheduled for another round of injections in mid-January 2014.  (R. 44.)  Claimant testified that the injections were ordered by his orthopedic doctor at Saint Anthony's after the doctor discovered arthritis in both Claimant's knees.  (R. 55.)  Claimant also participated in physical therapy to reduce his knee pain.  (R. 44.)  Claimant attended physical therapy twice a week for three weeks in August of 2013.  (R. 44-45.)  Claimant stated he made strides in his physical therapy sessions, but each visit was followed by additional pain.  (R. 53.)  In addition, Claimant testified that he takes pain medication approximately twice a week to combat his knee pain.  (R. 46.)  Claimant stated he takes Tylenol 3, Purenal, and Naproxen.  (R. 48.)  As a result of the Tylenol, Claimant stated he is slow.  (R. 49.)  Claimant testified, "I don't want to get up and do anything."  (*Id.*)  In response to his knee pain, in 2012, Claimant began using a cane when walking outside of his home.  (*Id.*)  Claimant stated when inside his home, he has other things to hold on to, like countertops.  (R. 56.)  Claimant testified that he uses the cane because he is unsure of when his knees will "give out" or "lock up."  (*Id.*)

In describing his wrist pain, Claimant stated his wrists "pop a lot."  (R. 47.)  Claimant stated that his left wrist hurts more often than his right.  (*Id.*)  Claimant further testified that his wrist pain inhibits him to lift "a whole lot of weight."  (*Id.*)  Claimant also stated that he has not sought treatment for his wrist because while the pain was "bad" at first, he now only experiences pain "every so often."  (R. 48.)

8

When asked to detail his physical capabilities, Claimant stated he could stand for approximately twenty to thirty minutes and walk for about thirty minutes. (*Id.*) Claimant stated he could sit for one hour. (R. 51.) Claimant also stated he could carry ten pounds, and he can kneel down, but cannot get up without support or help. (R. 56.)

**D. Vocational Expert's Testimony**

Vocational Expert Ron Malic (the "VE") also testified at the January 1, 2014 hearing in accordance with the Dictionary of Occupational Titles ("DOT") and the Selected Characteristics of Occupations ("SCO"). (R. 58-61.) The VE testified that Claimant's past relevant work as a janitor is classified as unskilled with heavy physical demands. (R. 58.) The ALJ then posed the following hypothetical question to the VE: would a fifty-year-old man with Claimant's work history and education who is able to occasionally climb, crouch, crawl, and kneel so long as he were not exposed to extreme cold be able to complete Claimant's past work as a janitor? (R. 59.) The VE replied that a person with those limitations would not be able to perform Claimant's past work. (*Id.*) The ALJ then asked if a person matching the previous description would be able to find other employment. (*Id.*) The VE stated that a person who was limited to light work would have a variety of jobs available to them. (*Id.*) The VE testified that such a person would be a polisher, of which there are 1,300 positions in Illinois. (*Id.*) Likewise, the VE stated that the person described could fill the role of fastener or packager, both which have over 1,000 positions in Illinois. (*Id.*) The ALJ next asked the VE if she limited the hypothetical person to no kneeling, crawling, or climbing of ladders, ropes, or scaffolding, would that have an effect on the jobs or their numbers? (*Id.*) The VE replied, no. (*Id.*) The ALJ stated, "I am not going to ask you any sedentary questions. He would grid out at all times relative to this case." (*Id.*) The hearing concluded with

the VE affirming that a person in many unskilled jobs commonly miss fourteen to fifteen days per year. (R. 60.)

## II. LEGAL ANALYSIS

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," she "must build an accurate and logical bridge from the evidence to [her] conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate her assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

**B. Analysis under the Social Security Act**

To qualify for disability insurance benefits or supplemental security income, a claimant must be "disabled" under the Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski*, 245 F.3d at 885-86. If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five-step analysis. At step one, the ALJ found that Claimant was not engaged in substantial gainful activity and had not been engaged in substantial gainful activity during the period from his amended alleged onset date of September 4, 2012. (R. 17.) At step two, the ALJ found that Claimant had the following severe impairments: degenerative joint disease and obesity. (*Id.*) The ALJ also noted Claimant's non-severe impairments of acute bronchitis, hyperlipidemia, history of drug abuse, and arthritis of the hands. (*Id.*) According to the record, none of these non-severe impairments resulted in any complications or work-related limitations. (*Id.*) At

11

step three, the ALJ found that Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 18.) At step four, the ALJ found that Claimant has the Residual Functional Capacity ("RFC") to perform light work as defined in 20 C.F.R. 416.967(b), except that he can occasionally climb, crouch, crawl, and kneel and can have no concentrated exposure to extreme cold. (*Id.*) In determining Claimant's RFC, the ALJ deduced that Claimant's impairment could reasonably be expected to cause some of his alleged symptoms; however, "...Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms" were not found to be entirely credible. (R. 19, 21.) Specifically, the ALJ's credibility determination was based on the overall evidence which showed that Claimant "received minimal treatment," his orthopedist noted a normal gait, Claimant reported "significant improvement" in his knee pain, and Claimant's ability to complete a "variety" of daily activities. (R. 21.) The ALJ also found that Claimant is unable to perform past relevant work. (R. 22.) Finally, at step five, the ALJ found that considering Claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Claimant can perform. (R. 23.) As a result, the ALJ found that Claimant has not been under a disability, as defined in the Act, since September 4, 2012. (*Id.*)

Claimant now argues: (1) the ALJ erred in weighing the medical opinion evidence of his treating physician and the State Agency doctor; (2) the ALJ improperly assessed Claimant's RFC by failing to evaluate Claimant's need for a cane; and (3) the ALJ failed to properly assess Claimant's subjective symptoms as "credible" under SSR 16-3p.

## C. The ALJ Did Properly Follow the "Treating Physician" Rule.

Claimant first argues that the ALJ failed to give the proper weight to his treating orthopedist when considering the medical evidence. *See* 20 C.F.R. § 416.927 (noting that a treating source's opinion is typically given controlling weight); *see also Koswenda v. Astrue*, __F. App'x__, 2017 WL 959542, at *4 (N.D. Ill. Apr. 2, 2017) (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)) ("An ALJ who discounts a treating physician's medical opinion must minimally articulate her reasons") (internal quotation omitted).

In order to assess how much weight a medical opinion should be granted, the ALJ must consider the "checklist of factors" that is outlined in 20 C.F.R. § 404.1527(c)(2)-(6). *See Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play"). Claimant contends that the ALJ failed to utilize this checklist and failed to articulate any sound reason for rejecting Dr. Chandrasekh's opinion from January 2015, in which he found that Claimant was limited in his ability to work due to severe arthritis. (R. 478.) *See, e.g., Larson v. Astrue*, 615 F.3d 755, 751 (7th Cir. 2010) (stating that when the ALJ declines to give controlling weight to the opinion of a treating physician, the ALJ must provide a reason for her decision). We disagree.

Claimant is correct that the Social Security regulations require the ALJ to consider a variety of factors, including: (1) the nature and duration of the examining relationship; (2) the length and extent of the treatment relationship; (3) the extent to which medical evidence supports the opinion; (4) the degree to which the opinion is consistent with the entire record; (5) the physician's specialization, if applicable; and (6)

13

other factors which validate or contradict the opinion. 20 C.F.R. § 404.1527(c); *Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014); *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). However, Claimant is incorrect that the ALJ did not use these factors in evaluating what weight to give Dr. Chandrasekh's opinion. (R. 20, 22.) The ALJ's opinion expressly states Dr. Chandrasekh's relationship with Claimant was "minimal" as he had only treated Claimant on three occasions prior to the hearing. (*Id.*) Moreover, the ALJ's opinion recognizes that Dr. Chandrasekh's examinations revealed normal findings and a normal gait and the x-rays he ordered of Claimant's knees provided "unremarkable" findings. (R. 20.) The ALJ acknowledged Dr. Chandrasekh's specialization as an orthopedist, but questioned his opinion in light of the entire record, especially the fact that the records note Claimant's positive response from the Lidocaine injections Dr. Chandrasekh ordered. (R. 22.) The ALJ concluded that Dr. Chandrasekh's January 2015 assessment of Claimant appeared to be based solely on Claimant's subjective allegations. *Bates v. Colvin,* 736 F.3d 1093,1100 (7th Cir. 2013) ("where a treating physician's opinion is based on the claimant's subjective complaints, the ALJ may discount it) (citing *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008)). As the ALJ did use the factors and provided several valid reasons for discounting Dr. Chandrasekh's opinion, the ALJ created a "logical bridge" between the evidence and her conclusion. *See Clifford*, 227 F.3d at 872; *see also Dixon*, 270 F.3d at 1177 (holding that the Seventh Circuit Court of Appeals will affirm all but the most patently erroneous reasons for discrediting a treating physician's opinion).

Furthermore, Claimant asserts that the opinion of Judith Sheldon, an advanced practice nurse corroborates Dr. Chandrasekh's opinion and thus the opinion should

have been given more weight is incorrect. (R. 22.) Although Nurse Sheldon's opinion is consistent with Dr. Chandrasekh's opinion, the ALJ accurately noted an advance practice nurse is not an acceptable medical source under the Social Security regulations. See 20 C.F.R. § 416.913(a).[1] Moreover, the ALJ opined that Nurse Sheldon's opinion was based on Claimant's subjective allegations, rather than objective evidence. (R. 22.) For these reasons, we will not remand on these grounds.

### D. The ALJ Improperly Assessed Claimant's RFC by Failing to Evaluate Claimant's Need for a Cane.

Next, Claimant argues that the ALJ erred in disregarding Claimant's reliance on a cane. In making a disability determination, an ALJ's RFC assessment must include an evaluation of medically determinable impairments. See Villano v. Astrue, 556 F.3d 558, 563 (7th Cir. 2009). This evaluation must be captured in a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). SSR. 96–8p, 1996 SSR LEXIS 5; see also Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

Here, Claimant primarily argues that the ALJ erred in assessing his RFC by not addressing his need to use a cane in order to walk outside of his home and to navigate stairs. (R. 56.) Claimant states this issue is paramount because if the ALJ properly considered his need for a cane, the VE would have taken this fact into account when deciding Claimant's ability to perform work. Claimant likens his case to Thomas v.

---

[1] This regulation has since been amended to include licensed advance practice registered nurses but the new regulation only applies to claims filed after March, 27, 2017. 20 C.F.R. 404.1502(a)(7).

*Colvin*, 534 Fed. Appx. 546 (7th Cir. 2013), and contends that this err requires remand. We agree.

The Commission defends the ALJ's decision, arguing that the medical evidence did not support Claimant's need for a cane. (R. 21.) Therefore, the ALJ did not need to include such a restriction in the hypothetical questions to the VE. *See Schmidt v. Astrue*, 496 F.3d 833, 845-46 (7th Cir. 2007). But, the medical evidence includes references that support Claimant's need for a cane. (R. 20, 56, 399, 461, 480, 486.) Although Claimant began using a cane without a prescription, the record indicates he was later prescribed a cane. (R. 419.) In addition, Ms. Kline, Claimant's physical therapist, report that Claimant would benefit from physical therapy "to decrease risk of fall due to knee instability…" (R. 480.) However, even after completing physical therapy, Claimant did fall due to his "knees giving out" and he was subsequently seen at an emergency department. Moreover, like the claimant in *Thomas,* Claimant was using the cane during the hearing and testified about why he needed it. In *Thomas,* the court held that because the ALJ failed to consider the claimant's need for a cane, the case required remanded. *Thomas*, 534 Fed.Appx at 550. This case is no different.

For these reasons, we find that remand is required in this case. On remand, the ALJ is to consider Claimant's testimony about his reliance on a cane, and the ALJ should articulate his or her reasons for disregarding this testimony in light of evidence in the medical record supporting Claimant's need for the cane.

**E. Remaining Claimant Arguments.**

In light of the remand, we will only briefly address the two additional arguments Claimant has raised. First, Claimant argues that the ALJ erred in failing to credit his

16

subjective complaints of pain.[2] An ALJ will engage in a credibility analysis when, as here, the alleged symptoms lack objective medical evidence. *See Golembiewski v. Barnhart*, 322 F.3d 912, 915-16 (7th Cir. 2003). In order to conduct a credibility determination in accordance with SSR 16-3p, the ALJ must follow a two-step process for evaluating symptoms. First, the ALJ must determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms. Second, the ALJ must evaluate an individual's symptoms based on the evidence in an individual's record, including objective medical evidence, statements from the individual, medical sources, and non-medical sources like agency personnel. SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). In addition, ALJs must consider the applicable factors set forth in 20 C.F.R. 404.1529(c)(3) and 416.929(c)(3). These factors include:

> Daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, an individual receives [sic] or has received [sic] for relief of pain or other symptoms; any measures other

---

[2] The Social Security Administration ("Administration") recently updated its guidance about evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). The new ruling eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1. Though SSR 16-3p post-dates the ALJ hearing in this case, the application of a new social security regulation to matters on appeal is appropriate where the new regulation is a clarification of, rather than a change to, existing law. *Pope v. Shalala*, 998 F.2d 473, 482-483 (7th Cir. 1993), overruled on other grounds by *Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999). See also *Cole v. Colvin*, 831 F.3d 411, 415 (7th Cir. 2016). A comparison of the previous and current guidance reveals substantial consistency. Both ruilings outline a two-step process to be followed and the factors to be considered when determining the intensity and persistence of a party's symptoms. Compare SSR 16-3p and SSR 96-7p. Stated differently, "[t]he agency has had only one position, although it has expressed that position in different words." *Homemakers N. Shore v. Bowen*, 832 F.2d 408, 413 (7th Cir. 1987). Therefore, it is appropriate to evaluate Claimant's credibility argument in light of the new guidance the Administration has provided.

than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016).

In this case, the ALJ noted Claimant could drive, wash his own laundry, go grocery shopping, cook meals, attend church services, take public transportation, mow the lawn, and take out the trash. (R. 19.) Claimant argues that the ALJ's listing of his arguably limited daily activities does not undermine or contradict his claim that he is in pain. *See Zurawski*, 245 F.3d. at 887 (noting ALJs should explain the inconsistencies that serve as the basis for a finding of not credible). Although we tend to believe that Claimant would be unable to overcome the highly deferential standard this Court applies to the ALJ's credibility determination, on remand this issue should be reevaluated to ensure it is not "patently wrong." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2010); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

Claimant also argues that the ALJ's reliance on the opinion of the State Agency doctor was flawed. "As a general rule, an ALJ is not required to credit the agency's examining physician in the face of a contrary opinion from a later reviewer or other compelling evidence." *Beardsley v. Colvin,* 758 F.3d 834, 839 (7th Cir. 2014). On remand, the ALJ should be certain to consider the appropriate weight to give the agency physicians in light of the overall medical evidence in the record. *See* SSR 96-6p; 20 C.F.R. § 416.927; *Dixon*, 270 F.3d at 1178 (ALJs are entitled to evaluate the entire record when making a disability determination).

18

**III. CONCLUSION**

For the reasons set forth above, Claimant's motion for summary judgment is granted and the Commissioner's cross-motion for summary judgment is denied. It is so ordered.

Dated: October 23, 2017

The Honorable Michael T. Mason